In the

# United States Court of Appeals

### For the Seventh Circuit

———————

No. 21-2325

SAINT ANTHONY HOSPITAL,

*Plaintiff-Appellant,*

*v.*

ELIZABETH M. WHITEHORN, in her official capacity
as Director of the Illinois Department of
Healthcare and Family Services,

*Defendant-Appellee,*

*and*

MERIDIAN HEALTH PLAN OF ILLINOIS, INC., *et al.,*

*Intervening Defendants-Appellees.*

———————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
On Remand from the Supreme Court of the United States.
No. 1:20-cv-02561 — **Steven C. Seeger**, *Judge.*

———————

ARGUED NOVEMBER 7, 2024 — DECIDED MARCH 14, 2025

———————

Before SYKES, *Chief Judge*, and EASTERBROOK, HAMILTON, BRENNAN, SCUDDER, ST. EVE, KIRSCH, JACKSON-AKIWUMI, LEE, PRYOR, KOLAR, and MALDONADO, *Circuit Judges.*[*]

BRENNAN, *Circuit Judge*. Saint Anthony Hospital provides care to underserved patients on Chicago's near west side. The hospital receives much of its funding from Medicaid, the joint federal-state program that covers health care costs for low-income individuals. A state receives federal funding in exchange for overseeing Medicaid within its borders. To help administer the program, some states contract with managed-care organizations or "MCOs"—private companies that coordinate health care services for their enrolled patients.

Over the years, Illinois has increasingly relied on MCOs to assist in facilitating the Medicaid program. As MCOs have taken on a larger role, Saint Anthony says it has received Medicaid payments later and later, if at all. The hospital brought this lawsuit, asserting a right to prompt payment under the Medicaid Act. Rather than pursue claims against the MCOs, though, Saint Anthony sued the State of Illinois through its director of the Department of Healthcare and Family Services. The issue before us is whether the hospital has a federal right to prompt payment enforceable under 42 U.S.C. § 1983 against the state. We hold that it does not.

# I

This case comes to us on the state's motion to dismiss for failure to state a claim. FED. R. CIV. P. 12(b)(6). We therefore

---

[*] Senior Circuit Judge Hamilton participated in the en banc hearing as a member of the panel originally assigned to this case. *See* 28 U.S.C. § 46(c).

"accept as true all of the allegations contained in" Saint Anthony's complaint. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

**A**

Saint Anthony Hospital has served the residents of Chicago's near west side since 1898. The provider qualifies as a "Safety-Net Hospital," meaning its patient population consists of mostly low-income individuals. 305 ILCS 5/5-5e.1. The hospital thus relies on the joint federal-state Medicaid program to maintain its charitable operation.

Medicaid is cooperative federalism at work. *See Nasello v. Eagleson*, 977 F.3d 599, 601 (7th Cir. 2020). Congress created the program to aid those who cannot pay for medical services on their own. 42 U.S.C. § 1396 et seq. A state that chooses to participate in Medicaid receives federal funding. In exchange, it agrees to administer the program and comply with federally imposed funding conditions. *See, e.g.*, *Bontrager v. Ind. Fam. & Soc. Servs. Admin.*, 697 F.3d 604, 605–06 (7th Cir. 2012). For instance, a state must provide the federal government with "a comprehensive written statement … describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with" the law. 42 C.F.R. § 430.10; 42 U.S.C. § 1396a(a). A state that fails to manage its Medicaid program in accordance with federal law risks losing its funding. 42 U.S.C. § 1396c.

For decades, Illinois administered Medicaid primarily through a fee-for-service program. Under this program, the state pays for a Medicaid enrollee's health care costs directly. For example, when a patient receives care from Saint Anthony, the hospital submits a claim to the state, and the state covers the cost. *See id.* § 1396a(a)(30)(A); *see also Midwest*

*Emergency Assocs.-Elgin Ltd. v. Harmony Health Plan of Ill., Inc.*, 888 N.E.2d 694, 696 (Ill. App. Ct. 2008).

But in 2006, Illinois ushered in a new era of Medicaid administration, introducing the managed-care program. That program involves a middleman: the MCO. The state contracts with MCOs—again, private companies—to facilitate Medicaid. *See* 42 U.S.C. § 1396u-2. And MCOs enter into separate contracts with providers to build health care networks. *Harmony Health Plan*, 888 N.E.2d at 696. Illinois pays MCOs flat monthly fees on a per-patient basis. The MCOs in turn agree to pay the actual medical expenses incurred by patients. *Bria Health Servs., LLC v. Eagleson*, 950 F.3d 378, 381 (7th Cir. 2020). So, when Saint Anthony provides care to a patient enrolled in the managed-care program, it submits a claim to an MCO, which covers the cost. The MCO both shoulders the risk of paying claims and accepts the reward of any excess funds it receives from the state.

While the fee-for-service and managed-care programs coexist, the latter now dominates in Illinois. The state shifted to managed care both to save money and to improve patient outcomes. But, as Saint Anthony sees it, the shift has caused nothing but financial stress for providers. The hospital says, among other things, that MCOs consistently delay making claim payments. It regularly waits anywhere from 90 days to two years for a payment to come through. In the interim, the hospital still must pay its employees and vendors, reducing cash on hand.

One might expect Saint Anthony to press claims for nonpayment against MCOs. Recall, MCOs have independent contractual relationships with providers. Saint Anthony has contracts with MCOs, and those contracts contain bargained-

for arbitration clauses. But rather than resolve its payment issues through arbitration, Saint Anthony sued the state in federal court.

**B**

Saint Anthony filed suit under 42 U.S.C. § 1983, alleging the state violated its right to receive prompt Medicaid payments. The hospital derives this supposed right from § 1396u-2(f) of the Medicaid Act—referred to as the timely payment provision. The timely payment provision mandates that "[a] contract" between the state and an MCO require the MCO "make payment to health care providers … on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A)" or some alternative agreed upon by the MCO and a provider. 42 U.S.C. § 1396u-2(f).

The timely payment provision expressly incorporates the procedures housed in § 1396a(a)(37)(A). That provision dictates the payment schedule a state must abide by under the fee-for-service program. Specifically, 90% of clean claims— claims where the payor has all the necessary information to make a payment—must be made within 30 days of receiving those claims. *Id.* § 1396a(a)(37)(A). And 99% of clean claims must be paid within 90 days. *Id.*

In its complaint, Saint Anthony alleged the state violated its right to prompt payment by failing to ensure MCOs comply with the 30-day/90-day payment schedule. It requested the district court issue a judgment declaring such a violation. And it sought an injunction that would require the state "to bring itself into compliance" with the timely payment provision "by causing each of its MCOs to" abide by the 30-day/90-day payment schedule.

Illinois moved to dismiss Saint Anthony's complaint under Federal Rule of Civil Procedure 12(b)(6), arguing the timely payment provision does not contain a right privately enforceable via § 1983. The district court granted the motion. In a thorough opinion, it concluded that "the statutory provisions in question do not give rise to a private right of action, because they do not create rights that are enforceable under section 1983."

Saint Anthony appealed, and this court reversed. *Saint Anthony Hosp. v. Eagleson (Saint Anthony I)*, 40 F.4th 492, 499 (7th Cir. 2022). The court held "that Saint Anthony … allege[d] a viable claim for relief under" the timely payment provision and was thus free to "seek injunctive relief under 42 U.S.C. § 1983 against the state." *Id.* at 498.[1] Illinois then filed a petition for a writ of certiorari in the Supreme Court.

While the state's petition was pending, the Supreme Court issued its opinion in *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023). Its decision expounded on the analytical framework courts must use to determine whether a law passed under the Spending Clause, like the Medicaid Act, creates a § 1983-enforceable right. Given the overlap between that case and this one, the Supreme Court later granted Illinois's petition for certiorari, vacated our court's judgment,

---

[1] At this earlier stage of the litigation, Saint Anthony argued another provision of the Medicaid Act also conferred on health care providers rights enforceable under § 1983—namely, 42 U.S.C. § 1396a(a)(8). But this court disagreed. *Saint Anthony I*, 40 F.4th at 515–16. Saint Anthony no longer pursues that theory. *See Saint Anthony Hosp. v. Whitehorn (Saint Anthony II)*, 100 F.4th 767, 775 n.1 (7th Cir. 2024), *reh'g en banc granted and opinion vacated*, No. 21-2325, 2024 WL 3561942 (7th Cir. July 24, 2024).

and remanded for reconsideration. *Eagleson v. Saint Anthony Hosp.*, 143 S. Ct. 2634 (2023).

Upon reconsideration, a divided panel of this court again reversed the district court's decision granting the state's motion to dismiss. The majority observed that the Supreme Court's remand "order call[ed] for further thought, but it d[id] not necessarily imply that the … previous result should be changed." *Saint Anthony II*, 100 F.4th at 773. To the majority, "[u]nder the standards of *Talevski* and related precedents, Saint Anthony" maintained "a viable claim for relief under" the timely payment provision. *Id.*

Illinois then sought review from our full court. Whether a hospital can sue a state in federal court to obtain relief and thereby alter the administration of a multibillion-dollar Medicaid program is an enormous question. For that reason, we agreed to hear this case en banc and now hold that § 1396u-2(f) of the Medicaid Act does not confer a § 1983-enforceable right on health care providers.

This case also presents a secondary issue—whether it was an abuse of discretion for the district court to deny Saint Anthony's motion to supplement its complaint—which we briefly return to at the end of this opinion.

## II

### A

Section 1983 supplies an injured party with a cause of action against someone who, acting "under color of" state law, deprives that party "of any rights, privileges, or immunities secured by the Constitution and laws" of the United States. 42 U.S.C. § 1983. The statute is not itself a source of substantive rights. It "merely provides a mechanism for enforcing

individual rights" found "elsewhere." *Gonzaga Univ. v. Doe*, 536 U.S. 273, 285 (2002). Section 1983 as we know it originated in Section 1 of the Civil Rights Act of 1871. *Monroe v. Pape*, 365 U.S. 167, 170–71 (1961). In the aftermath of the Civil War, Congress passed the Act in response to "the reign of terror imposed by the Klan upon black citizens and their white sympathizers in the Southern States." *Briscoe v. LaHue*, 460 U.S. 325, 337 (1983). The law was meant to remedy instances where "the ineffectiveness of state law enforcement" threatened an "individual's federal right to 'equal protection of the laws.'" *Id.* at 338 (quoting *Monroe*, 365 U.S. at 174).

Given this historical background, litigants have asked the Supreme Court to limit "laws," as the term is used in § 1983, to mean "civil rights or equal protection laws." *Maine v. Thiboutot*, 448 U.S. 1, 6 (1980). On that reading, an individual could invoke § 1983 to remedy deprivations of rights secured by only a discrete class of federal laws. But the Supreme Court has consistently rejected such a narrow interpretation of the statute. *Id.* at 4; *Talevski*, 599 U.S. at 175. "'[L]aws,' as used in § 1983, means what it says"—laws. *Thiboutot*, 448 U.S. at 4. Critical for this case, that includes federal laws—like the Medicaid Act—passed under Congress's spending power. Indeed, the Supreme Court has expressly refused to "rewrite § 1983's plain text" by carving out Spending Clause legislation from the term "laws." *Talevski*, 599 U.S. at 178.

Still, § 1983 provides a cause of action only for deprivations of "rights, privileges, or immunities." 42 U.S.C. § 1983. Before a party can rely on the enforcement mechanism to vindicate a federally secured right, federal law must actually secure the right. In other words, "[t]o seek redress through § 1983, a plaintiff must assert the violation of a federal *right*, not merely a violation of federal *law*." *Gonzaga*, 536 U.S. at 282

(quoting *Blessing v. Freestone*, 520 U.S. 329, 340 (1997)) (cleaned up).

The Supreme Court's guidance on how to ascertain whether a Spending Clause statute creates an enforceable right has not historically been a "model[] of clarity." *Id.* at 278. Shortly after deciding that § 1983 created a cause of action to remedy statutory rights violations, *Thiboutot*, 448 U.S. at 4, the Court provided early insight into how Congress must manifest its intent to confer rights via funding statutes. In *Pennhurst State School & Hospital v. Halderman*, the Court "insist[ed] that Congress speak with a clear voice." 451 U.S. 1, 17 (1981); *see also Gonzaga*, 536 U.S. at 280. Clarity is essential, the Court reasoned, because Spending Clause legislation "is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17. If a state fails to hold up its end of the bargain, "the typical remedy … is not a private cause of action" to enforce a right "but rather action by the Federal Government to terminate funds to the State." *Id.* at 28. It follows, then, that if Congress intends to depart from the typical remedy and grant the atypical remedy—a privately enforceable right—"it must do so unambiguously." *Id.* at 17; *Gonzaga*, 536 U.S. at 279–80.

In the four decades after *Pennhurst*, the Court only twice identified in Spending Clause statutes rights enforceable under § 1983. *Nasello*, 977 F.3d at 601; *Talevski*, 599 U.S. at 194 (Barrett, J., concurring). It held in *Wright v. Roanoke Redevelopment & Housing Authority* that tenants could enforce a rent ceiling provision in the Housing Act via § 1983. 479 U.S. 418, 429–30 (1987). And in *Wilder v. Virgina Hospital Ass'n*, the Court found a right belonging to health care providers in a reimbursement provision of the Boren Amendment to the

Medicaid Act. 496 U.S. 498, 509–10 (1990). *Wright* and *Wilder*
aside, the Court refused numerous invitations to permit
§ 1983 enforcement of federal funding laws. *See, e.g., Suter v.
Artist M.*, 503 U.S. 347, 363 (1992); *Blessing*, 520 U.S. at 343;
*Gonzaga*, 536 U.S. at 287; *City of Rancho Palos Verdes v. Abrams*,
544 U.S. 113, 127 (2005).

Although the Court developed a track record of refusing
to recognize privately enforceable rights, post-*Pennhurst* case
law progressed in a way that led lower courts to believe a
plaintiff could invoke § 1983 to vindicate "something less than
an unambiguously conferred right." *Gonzaga*, 536 U.S. at 282.
For instance, in *Blessing*, the Court set out a multifactor test
for evaluating whether a funding statute conferred a right.
520 U.S. at 340–41. "[S]ome courts … interpret[ed] *Blessing* as
allowing plaintiffs to enforce a statute under § 1983 so long as
the plaintiff f[ell] within the general zone of interest that the
statute [was] intended to protect." *Gonzaga*, 536 U.S. at 283.
That proved problematic to the Court. First, lower courts were
straying from *Pennhurst*, which imposed a higher hurdle be-
fore a right enforceable via § 1983 could be recognized. *Id.* at
279–80, 283. And second, courts were under the false impres-
sion that the test for identifying a § 1983-enforceable right was
far less demanding than the test for "creat[ing] rights enforce-
able directly from [a] statute itself under an implied private
right of action." *Id.* at 283; *see also Alexander v. Sandoval*, 532
U.S. 275, 286–87 (2001) (explaining the test for determining
whether a statute creates an implied private right of action).

Recognizing the confusion that had taken root, the Su-
preme Court set out to provide renewed clarity in this area of
the law.

**B**

The Court began to offer guidance in *Gonzaga*. There, it refused to read into the Family Educational Rights and Privacy Act, 20 U.S.C. § 1232g, an individual right "not to have 'education records' disclosed to unauthorized persons without [a] student's express written consent." *Gonzaga*, 536 U.S. at 279, 290. In doing so, the Court expressly "reject[ed] the notion that [its] cases permit anything short of an unambiguously conferred right to support a cause of action brought under § 1983." *Id.* at 283. It eschewed an approach to identifying rights based on "a multifactor balancing test" that "pick[s] and choose[s] which federal requirements may be enforced." *Id.* at 286. Rather, the Court held that Congress can confer a right in a Spending Clause statute only when the law uses "explicit rights-creating terms" and is "phrased 'with an unmistakable focus on the benefited class.'" *Id.* at 284 (emphasis omitted) (quoting *Cannon v. Univ. of Chi.*, 441 U.S. 677, 691 (1979)). Even then, the right is only "presumptively enforceable." *Id.* The presumption may be rebutted upon a showing that Congress intended to preclude § 1983 enforcement—either explicitly or implicitly. *Id.* at 284 n.4.

Although it cast doubt on some of its earlier decisions, the Court in *Gonzaga* did not overrule cases like *Wright*, *Wilder*, and *Blessing*. So, confusion persisted. For example, courts—including this one—continued to apply *Blessing*'s multifactor test to determine whether a piece of Spending Clause legislation created individual rights, despite the Supreme Court's instructions to take a more focused approach. *See, e.g., Saint Anthony I*, 40 F.4th at 503 (invoking the *Blessing* factors).

Then came *Talevski*. At issue there was whether a plaintiff could invoke § 1983 to enforce certain provisions of the

Federal Nursing Home Reform Act, 42 U.S.C. § 1396r(c). Before deciding that question in the affirmative, the Supreme Court put to rest any doubt that "*Gonzaga* sets forth [the] established method for ascertaining" whether a Spending Clause law "unambiguous[ly] confer[s]" an enforceable right. *Talevski*, 599 U.S. at 183. All nine Justices agreed on that point. *Id.*; *see also id.* at 230 (Alito, J., dissenting) (agreeing with the majority that *Gonzaga* provides the relevant analytical framework). The Court in *Talevski* responded to the continued confusion among lower courts following *Gonzaga* with its clearest articulation to date of the proper analytical framework.

The test for analyzing whether a Spending Clause statute contains a right enforceable via a § 1983 private cause of action is twofold. The first step "sets a demanding bar." *Id.* at 180. Consistent with *Gonzaga*, courts must rely on "traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." *Id.* at 183 (quoting *Gonzaga*, 536 U.S. at 283, 285–86). To overcome this first obstacle, the statutory provision must be "phrased in terms of the persons benefited and contain[] rights-creating, individual-centric language with an unmistakable focus on the benefited class." *Id.* (quoting *Gonzaga*, 536 U.S. at 284, 287) (cleaned up).

Identifying rights-creating language proves key, as "it is *rights*, not the broader or vaguer 'benefits' or 'interests,' that may be enforced under the authority of" § 1983. *Gonzaga*, 536 U.S. at 283. Individual-centric language is equally paramount, as Congress needed to have more in mind than a group's general interests. It must have "'intended to create a federal right' *for* the identified class." *Talevski*, 599 U.S. at 183 (quoting *Gonzaga*, 536 U.S. at 283). Said another way, a party cannot

"enforce a statute under § 1983" merely because it "falls within the general zone of interest that the statute is intended to protect." *Gonzaga*, 536 U.S. at 283.

If a court concludes a Spending Clause law "unambiguously secures rights" because it contains the requisite rights-creating, individual-centric language, those rights are still only presumptively enforceable under § 1983. *Talevski*, 599 U.S. at 186. At step two, a defendant may rebut the presumption. To do so, that party must show Congress either explicitly or implicitly intended to preclude § 1983 enforcement. *Id.* As to the former, Congress may, "of course, expressly forbid § 1983's use." *Id.* But Congress can also implicitly preclude § 1983 enforcement when a private cause of action under that statute would be incompatible with "the design of the enforcement scheme in the rights-conferring statute." *Id.* at 187; *see also City of Rancho Palos Verdes*, 544 U.S. at 120. The Supreme Court has explained that the implicit-preclusion "inquiry boils down to what Congress intended, as divined from text and context." *Talevski*, 599 U.S. at 187.

To be sure, the Supreme Court still has not expressly overruled earlier private rights of action cases like *Wright*, *Wilder*, and *Blessing,* even though those cases can be read as employing a less demanding framework.[2] *See Planned Parenthood S. Atl. v. Kerr*, 95 F.4th 152, 166–67 (4th Cir. 2024*), cert. granted in part sub nom. Kerr v. Planned Parenthood*, No. 23-1275, 2024 WL 5148085 (U.S. Dec. 18, 2024); *id.* at 170 n.2 (Richardson, J., concurring in the judgment). But whatever is left of that earlier

---

[2] The Supreme Court has expressed, however, considerable doubts about *Wilder* in particular. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 330 n.* (2015) ("[O]ur later opinions plainly repudiate the ready implication of a § 1983 action that *Wilder* exemplified.").

line of cases is largely beside the point. The Court in *Talevski* unanimously identified the *Gonzaga* framework as the proper method for ascertaining whether Congress conferred a § 1983-enforceable right in a Spending Clause law. *Talevski*, 599 U.S. at 183; *see also id.* at 230 (Alito, J., dissenting). And it cautioned against finding enforceable rights "as a matter of course." *See id.* at 183. After all, "§ 1983 actions are the exception—not the rule—for violations of Spending Clause statutes." *Id.* at 193–94 (Barrett, J., concurring).

Heeding the Court's guidance and caution in *Talevski*, we proceed to analyze whether the timely payment provision creates a § 1983-enforceable right.

### III

Saint Anthony submits that § 1396u-2(f) of the Medicaid Act confers a right on health care providers to receive prompt Medicaid payments. It argues it can sue Illinois under § 1983 to force the state to remedy systemic violations of that right perpetrated by MCOs. The state responds that § 1396u-2(f) creates no such right, and even if it did, Saint Anthony cannot rely on § 1983 to enforce the right. In the state's view, a private right of action would be inconsistent, at *Gonzaga*'s second step, with its authority to enforce its contracts with MCOs.

We review de novo the district court's decision to dismiss the hospital's complaint. *Fosnight v. Jones*, 41 F.4th 916, 921 (7th Cir. 2022). Because the timely payment provision does not "unambiguously confer individual federal rights" on health care providers, Saint Anthony cannot overcome the *Gonzaga* framework's demanding first step. *Talevski*, 599 U.S. at 180 (emphasis omitted) (citing *Gonzaga*, 536 U.S. at 280). We therefore affirm without reaching the second step.

**A**

Our first task is to determine whether the timely payment provision "contains rights-creating, individual-centric language with an unmistakable focus on the benefited class"—here, health care providers like Saint Anthony. *Id.* at 183 (quoting *Gonzaga*, 536 U.S. at 284, 287) (cleaned up). That provision reads:

> A contract under section 1396b(m) of this title with a medicaid managed care organization shall provide that the organization shall make payment to health care providers … on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule … .

42 U.S.C. § 1396u-2(f).

The provision cross-references § 1396a(a)(37)(A), which sets forth a default payment schedule that, absent some other agreement, must be included in a contract between the state and an MCO. Once included in a contract, the payment schedule requires an MCO to pay providers 90% of clean claims—again, claims where the MCO has all the information to make a payment—within 30 days. *Id.* § 1396a(a)(37)(A). The schedule also requires an MCO to pay 99% of clean claims within 90 days. *Id.*

Noticeably missing from § 1396u-2(f) is any mention of rights. True, the presence or absence of that term is not in and of itself dispositive of the step-one inquiry. The statute need only contain "rights-creating language," not necessarily the word "right." *See Talevski*, 599 U.S. at 183 (quoting *Gonzaga*,

536 U.S. at 290). But the silence speaks loudly here. Indeed, not only does § 1396u-2(f) not use the term, but nothing in the text signals Congress meant to confer a right on providers to receive prompt payments. Nor does it signal Congress intended to impose a corresponding duty on the state to ensure MCOs make timely payments. Instead, the timely payment provision directs the states to include in contracts with MCOs the default payment schedule housed in § 1396a(a)(37)(A) or some qualifying alternative.

The language here is thus a far cry from that contained in the Federal Nursing Home Reform Act (FNHRA)—language the Court in *Talevski* held satisfied the first step of the *Gonzaga* framework. One of the provisions at issue there directed "nursing facilities to 'protect and promote' residents' '*right* to be free from … any physical or chemical restraints imposed for purposes of discipline or convenience.'" *Talevski*, 599 U.S. at 181–82 (emphasis added) (quoting 42 U.S.C. § 1396r(c)(1)(A)(ii)). The other provision, "[n]estled in a paragraph concerning 'transfer and discharge *rights*,'" *id.* at 184–85 (quoting § 1396r(c)(2)), barred nursing homes from "transfer[ring] or discharg[ing] a resident unless certain preconditions are met." *Id.* at 185 (quoting § 1396r(c)(2)(A)–(B)) (cleaned up). And both provisions were situated in "§ 1396r(c), which expressly concerns requirements *relating to residents' rights*." *Id.* at 184 (internal alteration and quotation omitted).

FNHRA repeatedly and explicitly referred to rights. That was enough for the Court to hold that "*Gonzaga*'s stringent standard" had been met. *Id.* at 186. If, as the Court indicated, FNHRA represented the "atypical case" in which a Spending Clause statute contained the requisite rights-creating language, then the timely payment provision must fall within the

heartland of typical cases. *See id.* at 183. That is, the typical case where a Spending Clause law does not create a federal right but merely conditions federal funds on a state's compliance with certain requirements—here, the condition to include the prompt payment schedule in contracts with MCOs. *Pennhurst*, 451 U.S. at 17, 28.

What the timely payment provision lacks in rights-creating language, it also lacks in the necessary "individual-centric language." *Talevski*, 599 U.S. at 183. Recall, to confer an individual right, a funding statute must have an "unmistakable focus on the benefited class." *Id.* (quoting *Gonzaga*, 536 U.S. at 284, 287). It is not enough that the "plaintiffs fall 'within the general zone of interest that the statute is intended to protect.'" *Id.* (quoting *Gonzaga*, 536 U.S. at 283).

The timely payment provision is not unmistakably focused on providers like Saint Anthony. It is instead expressly focused on what a contract between a state and MCO must contain—namely, the default 30-day/90-day payment schedule. In this way, § 1396u-2(f)'s primary concern centers on the *state's* contractual relationship with *MCOs*, not what, if any, rights providers are entitled to under federal law.

Saint Anthony points us to the provision's mandatory language and its reference to providers: State contracts with MCOs "*shall* provide that the [MCOs] *shall* make payment to health care providers … ." 42 U.S.C. § 1396u-2(f) (emphasis added). To the hospital, this mandatory language coupled with an explicit reference to providers leads to but one conclusion: Congress intended for providers to be the direct beneficiaries of § 1396u-2(f). We are not persuaded.

Each "shall" in the provision serves a distinct purpose. The first requires a state to include in its contracts with MCOs the default payment schedule. That aspect of § 1396u-2(f) contemplates two parties—neither of which is a health care provider. The second "shall" defines an MCO's contractual obligation: The MCO must make timely payments. Here, Saint Anthony is correct that the provision implicates providers. Providers, after all, receive those timely payments. But the fact that providers may benefit from a state including the prompt payment schedule in its contracts with MCOs does not mean § 1396u-2(f) is unmistakably focused on providers. Providers, at most, fall within the timely payment provision's zone of interest. Again, that alone is not enough for a plaintiff to stake a claim to a § 1983-enforceable right.

Consider *Gonzaga*. There, a student invoked § 1983 to enforce a supposed right not to have an academic institution release his educational records absent consent. 536 U.S. at 279. At issue was a provision of the Family Educational Rights and Privacy Act (FERPA), which said:

> No funds shall be made available under any applicable program to any educational agency or institution which has a policy or practice of permitting the release of education records (or personally identifiable information contained therein …) of students without the written consent of their parents to any individual, agency, or organization.

*Id.* (quoting 20 U.S.C. § 1232g(b)(1)).

The Court rejected the notion that the FERPA provision conferred "the sort of *individual* entitlement that is enforceable under § 1983." *Id.* at 287 (internal quotation omitted). Rather,

the statutory text spoke "only to the Secretary of Education," forbidding that official from making funds available to institutions with "a prohibited 'policy or practice.'" *Id.* (quoting 20 U.S.C. § 1232g(b)(1)). The Court held that the focus of the FERPA provision was "two steps removed from the interests of individual students and parents." *Id.* Because the statute lacked the requisite individual-centric language, the Court was unwilling to recognize a § 1983-enforceable right. *Id.*

The same holds true here. The statutory text of the timely payment provision speaks only to contracts between states and MCOs. Like the student in *Gonzaga*, then, providers are too far removed from the provision to claim that it creates an individual, § 1983-enforceable entitlement. Nobody disputes Saint Anthony benefits from Illinois including payment schedules in its contracts with MCOs. But students benefit from FERPA limiting funding to institutions that obtain consent before releasing records, too. A beneficiary is not necessarily a right-holder. *See id.* at 281. Saint Anthony is merely a beneficiary that falls within § 1396u-2(f)'s zone of interest. Consistent with *Gonzaga*, the fact that the timely payment provision mentions providers is not enough, without more, to confer an individual-centric right.

Text is our starting point, but courts must read Spending Clause laws, like all statutes, in context. *Talevski*, 599 U.S. at 184; ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 167 (2012) ("Context is a primary determinant of meaning."). On this point, the majority and dissenting opinions agree. We disagree with our dissenting colleagues, however, about where context leads us. Here, interpreting the statute as a whole confirms that § 1396u-2(f) does not confer upon hospitals, like Saint Anthony, a statutory right to prompt payment enforceable against the state.

If Congress intended to statutorily prescribe that providers receive prompt payments, it might have imposed a duty directly on MCOs to make timely payments. That would be more straightforward than creating a federal right to timely payment by placing a duty on the state to ensure MCOs pay providers on time. After all, in neighboring provisions of § 1396u-2, Congress did impose obligations directly on MCOs. For example, MCOs must, "upon request, make available to enrollees and potential enrollees … [t]he identity, locations, qualifications, and availability of health care providers." 42 U.S.C. § 1396u-2(a)(5)(B)(i). They also have to share information about "[t]he rights and responsibilities of enrollees" and "[t]he procedures available to an enrollee and a health care provider to challenge or appeal the failure of the organization to cover a service." *Id.* § 1396u-2(a)(5)(B)(ii)–(iii). And § 1396u-2(b)(7) requires MCOs to abstain from "discriminat[ing] with respect to participation, reimbursement, or indemnification as to any provider who is acting within the scope of the provider's license or certification under applicable State law, solely on the basis of such license or certification." *Id.* § 1396u-2(b)(7).

Saint Anthony's strained reading of the timely payment provision—one that would force the state to ensure MCOs satisfy their payment obligations or face a civil suit—finds no support in the statutory context. Congress knew how to expressly impose obligations on MCOs. We know this because it did. Had Congress meant to statutorily require that providers receive prompt payments, we might expect it to have placed another obligation on MCOs. But that is not what it did in § 1396u-2(f). Congress instead mandated states include prompt payment provisions in their contracts, thereby giving

rise to *contractual* obligations on the part of MCOs—contractual obligations owed to the *state*.

That Congress vested states with discretion to terminate their contracts with noncompliant MCOs is further contextual evidence that Saint Anthony cannot force Illinois to guarantee timely payments through a private right of action. Section 1396u-2(e)(4)(A) of the Medicaid Act provides that "the State shall have authority to terminate" its contract with an MCO when the organization "has failed to meet the requirements of … a contract."42 U.S.C. § 1396u-2(e)(4)(A).[3] So, Illinois has authority to terminate a contract with an MCO that fails to pay providers according to the 30-day/90-day payment schedule, but the authority is discretionary. If, however, Saint Anthony could sue the state to ensure MCOs make prompt payments, there would be no legal barrier to the hospital requesting that a federal court order the state to terminate its contract with a noncompliant MCO—as long as doing so would ensure prompt payments to providers. Indeed, Saint Anthony sought this very relief in its original complaint. Yet such an order would strip the state of its discretion to terminate contracts under § 1396u-2(e)(4)(A). The existence of the state's discretionary authority thus undermines Saint Anthony's contention that Congress created an enforceable right to prompt payment in the timely payment provision. *See Maracich v. Spears*, 570 U.S. 48, 68 (2013) (interpreting a statute to avoid creating tension between provisions).

---

[3] Because we do not reach the *Gonzaga* framework's second step, we express no view on whether the Medicaid Act's contractual enforcement scheme is so incompatible with a private right of action that it shows Congress implicitly precluded § 1983 enforcement. *See Talevski*, 599 U.S. at 187–88.

While context should inform our understanding of a statute, Saint Anthony relies almost exclusively on context in its interpretation of the timely payment provision. Ultimately, though, none of the contextual clues the hospital offers transforms § 1396u-2(f) into a rights-creating statute.

First, Saint Anthony points out that the timely payment provision was enacted as part of the Balanced Budget Act of 1997 in a section entitled "Assuring Timeliness of Provider Payments." *See* Pub. L. No. 105-33, § 4708(c), 111 Stat. 251, 506. To the hospital, the title shows Congress created a right because it meant to assure—or guarantee—providers receive timely payments. Even if we credit Saint Anthony's argument by assuming the title contains rights-creating language, "headings and titles are not meant to take the place of the detailed provisions of the text. Nor are they necessarily designed to be a reference guide or a synopsis." *Bhd. of R.R. Trainmen v. Balt. & Ohio R.R. Co.*, 331 U.S. 519, 528 (1947); *see also City & County of San Francisco v. EPA*, No. 23-753, 2025 WL 676441, at *7 (U.S. Mar. 4, 2025) ("The title of a statutory provision can inform its interpretation, but it is not conclusive."). The section title Saint Anthony offers cannot serve as a substitute for the otherwise missing rights-creating, individual-centric language within the timely payment provision.

The dissenting opinion is correct that headings and titles can help clarify statutory ambiguities. But here, that argument concedes the point. If § 1396u-2(f) is ambiguous such that the title must be consulted to clarify its meaning, the provision cannot also unambiguously confer a right upon providers. *Pennhurst*, 451 U.S. at 17.

Saint Anthony next directs us to a neighboring provision of the Medicaid Act, § 1396u-2(h)(2)(B). Like § 1396u-2(f), that section mandates a state include in its contract with an MCO a requirement that the MCO pay "Indian health care providers" according to the 30-day/90-day payment schedule. 42 U.S.C. § 1396u-2(h)(2)(B). Section 1396u-2(h)(2)(B) references the timely payment provision, identifying it as the "rule for prompt payment of providers." *Id.* This reference, Saint Anthony says, is evidence of how Congress interprets the timely payment provision—namely, that the legislature understands the provision as ensuring "providers" receive "prompt payment." But just as a title cannot supply missing rights-creating, individual-centric language, neither can the shorthand Congress uses to reference the timely payment provision in a neighboring part of the Medicaid Act. *See* SCALIA & GARNER, *supra*, at 316 ("Courts should not look at large for 'congressional intent'" to create a private right of action; "they should look for the fair import of the statute.").

Last, Saint Anthony points to provisions of the Medicaid Act concerning a state's reporting and oversight rights and obligations. *See* 42 U.S.C. § 1396u-2(c)(2)(A)(i) (requiring a state's contract with an MCO "provide for an annual … external independent review … of the quality outcomes and timeliness of, and access to, the items and services for which the organization is responsible under the contract"); *id.* § 1396b(m)(2)(A)(iv) (requiring a contract "provide[] that … the State … shall have the right to audit and inspect any books and records" of MCOs "pertain[ing] … to services performed or determinations of amounts payable under contract"); *see also* 42 C.F.R. § 438.66. Saint Anthony submits that, by including these oversight provisions, Congress must have meant to place a statutory duty on the state to ensure MCOs

comply with the timely payment provision—a duty Saint Anthony can sue the state to carry out. But the conclusion does not necessarily follow. Congress may have simply wanted to ensure a state can collect information to ascertain whether an MCO is complying with the timely payment provision and other contractual terms. That way, the state can make informed decisions about whether to exercise its discretionary contractual enforcement authority. *See, e.g.*, 42 U.S.C. § 1396u-2(e)(4)(A).

None of Saint Anthony's contextual arguments can overcome the fact that § 1396u-2(f) does not contain language that manifests Congress's unambiguous intent to confer on health care providers a right to timely Medicaid payments.

*        *        *

The Supreme Court has repeatedly cautioned courts against identifying § 1983-enforceable rights in Spending Clause statutes. *See, e.g.*, *Gonzaga*, 536 U.S. at 283; *Talevski*, 599 U.S. at 180. The *Gonzaga* framework imposes a significant hurdle for a funding law to clear before we read into it such a right. Because the timely payment provision lacks rights-creating, individual-centric language, it fails to clear that hurdle.

**B**

When a plaintiff invites a court to recognize an enforceable right in a Spending Clause statute, the request often implicates separation-of-powers and federalism concerns. Both concerns are top of mind here. And both confirm that the timely payment provision does not confer upon providers a right to timely payment enforceable against the State of Illinois under § 1983.

To begin, "[c]reating new rights of action is a legislative rather than a judicial task." *Nasello*, 977 F.3d at 601; *see also Egbert v. Boule*, 596 U.S. 482, 503 (2022) (Gorsuch, J., concurring in the judgment) ("To create a new cause of action is to assign new private rights and liabilities—a power that is in every meaningful sense an act of legislation."). That explains why the first step of the *Gonzaga* framework sets such a "demanding bar." *Talevski*, 599 U.S. at 180. Courts must be absolutely sure Congress intended to create a privately enforceable right in a Spending Clause law because creating rights is for Congress alone to do. "This paradigm respects" the legislature's "primacy in this arena and thus vindicates the separation of powers." *Id.* at 183 (citing *Gonzaga*, 536 U.S. at 286).

Saint Anthony offers several policy arguments for why its interests might be better served if it could sue the state to force MCOs to make timely payments. It says, for example, Congress could never have meant to create a mere paper right to prompt payment. Implicit in this argument is Saint Anthony's suggestion that the more effective way to guarantee hospitals receive prompt payments is by subjecting states to civil suits for failing to ensure MCOs pay on time, rather than by requiring states to contractually obligate MCOs to pay on time. But courts are not in the business of policy. Even if Saint Anthony offered irrefutable evidence that it would receive more timely payments if it could sue the state under § 1983, Congress has not signaled an unambiguous intent to confer on hospitals a privately enforceable right. We cannot, then, agree to read a right into the statute. *See Talevski*, 599 U.S. at 183.

As we see it, Congress had a number of choices when drafting the timely payment provision. It could, as Saint Anthony wishes, have developed a regime where the state has a

statutory duty to ensure MCOs promptly pay providers. It also could have placed a statutory duty directly on MCOs to pay providers on time. Alternatively, Congress could (and, in fact, did) create a regime where MCOs have a contractual duty to the state to pay providers according to the 30-day/90-day default payment schedule. Its decision to create contractually—not statutorily—enforceable rights was a uniquely legislative one. *Sandoval*, 532 U.S. at 286–87 (Unless Congress intends to create a privately enforceable right, "a cause of action does not exist and courts may not create one, no matter how desirable that might be as a policy matter.").

Out of respect for Congress, we will not replace § 1396u-2(f)'s contract-based scheme with a statutory-based one. Nor will we rearrange the players so that providers have enforceable rights against the state, rather than the state against MCOs. "Raising up causes of action where a statute has not created them" is not a "proper function … for federal tribunals." *Id.* at 287 (internal quotation omitted). Our decision reinforces this separation-of-powers principle.

To decide to the contrary would also raise serious federalism concerns. As noted at the outset, Medicaid is a form of cooperative federalism. *Nasello*, 977 F.3d at 601. Like other Spending Clause statutes, the law conditions federal funds on a state agreeing to comply with various conditions. *Id.*; *Pennhurst*, 451 U.S. at 11. In other words, the federal government and individual states engage in a bargain: The state receives money in exchange for abiding by a federal scheme.

In the timely payment provision, Illinois agreed to include in its contracts with MCOs the default payment schedule or an adequate alternative. By accepting that obligation, the state also assumed the risk that the federal government would cut

funding if it failed to comply. As explained, "the typical remedy for state noncompliance with federally imposed conditions is not a private cause of action for noncompliance but rather action by the Federal Government to terminate funds to the State." *Pennhurst*, 451 U.S. at 28; *see also Gonzaga*, 536 U.S. at 280; *Talevski*, 599 U.S. at 183. If Congress meant, instead, to subject the state to private lawsuits for noncompliance, Illinois needed to be on notice so it could decide whether to nonetheless accept federal funds. Because Congress did not, "with a clear voice," create a right enforceable against the state, we would upset the bargain struck between Illinois and the federal government if we allowed Saint Anthony to sue the state under § 1983. *Pennhurst*, 451 U.S. at 17. And we would risk transforming an exercise of cooperative federalism into one of compulsive federalism.

The relief Saint Anthony seeks in this case also runs headlong into principles of federalism. Among other things, the hospital seeks injunctive relief, requiring the state to "caus[e] each of its MCOs to" comply with the 30-day/90-day payment schedule. But if we opened the courthouse doors to that kind of injunctive relief by recognizing an individual right to prompt payments—absent clear Congressional authority to do so—it would turn federal trial courts into de facto Medicaid claims processors. Thousands of claims worth millions of dollars could be routed to the district courts. Thrusting *federal* tribunals into payment processing is a dubious solution to the alleged late-payment problem. This is especially so when Congress has provided the *states* with the tools to address MCOs' failures to comply with contractual terms—including payment schedules. Most notably, Congress vested the states with discretion to terminate any contract with an MCO when

the MCO "has failed to meet the requirements of th[at] … contract." 42 U.S.C. § 1396u-2(e)(4)(A).

Recognizing the problem with district courts having to adjudicate late-payment issues claim by claim, Saint Anthony argues the federal judiciary would be called upon to enjoin only "systemic" late payments. Said another way, a provider could invoke the timely payment provision to request an injunction only when MCO payments become so chronically late that it would be more palatable for a federal tribunal to force a state into pursuing a system-wide solution.

To start, there is an obvious disconnect between Saint Anthony arguing § 1396u-2(f) vests providers with an *individual* right, while simultaneously arguing relief is available only for *systemic* rights violations. Dispositive, though, is that the hospital's argument finds no textual support in § 1396u-2(f) or surrounding provisions. The law says nothing about the state ensuring MCOs make timely payments at the system-wide level. What is more, a district court would have no principled way of deciding when the problem becomes systemic— whether it considers the degree of tardiness, the number of MCOs behind on payments, or both.

This arbitrary systemic metric is offered as a way of avoiding the inevitable consequence of finding a § 1983-enforceable right in the timely payment provision. Federal district courts would become enmeshed in Medicaid payment processing and resulting disputes. Equally worrisome, federal courts would wield the largely unchecked power of dictating how Illinois oversees its multibillion-dollar managed-care program.

Reading a § 1983-enforceable right into the timely payment provision would raise serious separation-of-powers and

federalism concerns. Absent a clear directive from Congress that § 1396u-2(f) was meant to confer upon providers an individual right to timely payments, we decline to place federal district courts in the role of Medicaid payment processors.

## IV

We briefly address a secondary issue. While the state's motion to dismiss was pending in the district court, Saint Anthony moved to supplement its complaint under Federal Rule of Civil Procedure 15. Specifically, the hospital sought to add allegations that Illinois (1) failed to provide it with information pertaining to how payments are calculated under the fee-for-service program and (2) failed to ensure MCOs provide the same information under the managed-care program. In Saint Anthony's view, all this amounted to a violation of its due process rights.

After the district court granted the state's Rule 12(b)(6) motion, it denied the hospital's motion to supplement. On appeal, Saint Anthony argued the district court erred. This court agreed, deeming the district court's decision an abuse of discretion. *Saint Anthony I*, 40 F.4th at 517. The court maintained its position following the Supreme Court's remand order. *Saint Anthony II*, 100 F.4th at 795. Because we vacated that panel opinion, this issue requires our resolution.

Rule 15(d) provides: "On motion and reasonable notice, the court may, on just terms, permit a party to serve a supplemental pleading setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." FED. R. CIV. P. 15(d). The rule is thus a mechanism for "bringing the case up to date." 6A CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 1504 (3d ed.). We review a district court's

decision to deny a motion to supplement for abuse of discretion. *In re Wade*, 969 F.2d 241, 250 (7th Cir. 1992).

The district court here declined Saint Anthony's request to supplement its complaint, concluding in part that doing so would "substantially expand the scope of the case" by bringing in issues related to Illinois's fee-for-service program. Because the original complaint focused solely on the state's managed-care program—a multibillion-dollar program on its own—we cannot say the court abused its discretion by denying Saint Anthony's motion. The proposed supplement would have done far more than update the case. We therefore affirm on this basis.

Unlike the district court, though, we do not offer a view on the futility of allowing Saint Anthony to file a supplemental complaint. As a best practice, only after receiving full briefing on the issue should a district court deny a party's motion to supplement a complaint based on futility. *Cf. Zimmerman v. Bornick*, 25 F.4th 491, 494 (7th Cir. 2022) ("The law is clear that a court should deny leave to amend only if it is *certain* that amendment would be futile." (emphasis added)). That did not occur here, as Saint Anthony was denied an opportunity to defend its proposed supplement after the state raised the futility issue.

But the hospital still has an opportunity to prosecute its payment-transparency allegations if it chooses. The state expressly stipulated that it would "not assert … the defense of claim preclusion" if the hospital initiated a new action.[4] The

---

[4] D.E. 59 at 2.

state reaffirmed its stipulation at oral argument.[5] Saint Anthony may therefore proceed in a separate case.

## V

The timely payment provision lacks the rights-creating, individual-centric language necessary to recognize a § 1983-enforeable right. Out of respect for both Congress and the State of Illinois, we cannot read a right into the statute based on anything less.

AFFIRMED.

---

[5] Oral Argument at 1:00:50–1:02:03.

HAMILTON, *Circuit Judge*, joined by JACKSON-AKIWUMI and MALDONADO, *Circuit Judges*, dissenting. When Congress amended the Medicaid program to encourage more use of managed care, it recognized that managed care organizations would have powerful financial incentives to pay hospitals and other health care providers slowly, and as little as possible. Congress built into the legislation guardrails to protect hospitals, other health care providers, and especially patients.

This case is about one of those guardrails. The question is whether 42 U.S.C. § 1396u-2(f) gives plaintiff Saint Anthony Hospital a right enforceable under 42 U.S.C. § 1983 to have State officials use their many powers to require managed care organizations to meet what Congress itself called the "rule for prompt payment of providers." 42 U.S.C. § 1396u-2(h)(2)(B). The better answer is yes. This is the answer based on the statutory text and the cumulative weight of the statutory history and its larger context. A yes answer also fits within the relevant Supreme Court cases applying section 1983 to statutes enacted under the Spending Clause of Article I of the Constitution.

Before diving into the statutory text, history, and context, two points need clarification. First, Saint Anthony is not seeking and could not seek damages from the State or the defendant State officials named in their official capacities. This is basic law under section 1983 and the Eleventh Amendment. See *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989); *Kroll v. Board of Trustees of Univ. of Illinois*, 934 F.2d 904, 907 (7th Cir. 1991) (explaining these principles). What Saint Anthony seeks is a federal injunction to make State officials do what the law requires them to do anyway:

enforce the terms of the State's own contracts with managed care organizations requiring timely payments to Saint Anthony and others who care for Medicaid patients.

Second, we should understand that this lawsuit is a desperate measure. As of February 2020, Medicaid managed care organizations were past due on at least $20 million in payments to Saint Anthony. The late payments were having a dramatic effect on the hospital. Back in 2015, Saint Anthony had more than $20 million in cash on hand. That was enough to fund 72 days of operation. As the State increased its reliance on managed care, however, Saint Anthony saw its cash reserves dwindle. By 2019, Saint Anthony had less than $500,000 cash on hand, enough to cover just two days of operation. Saint Anthony's net revenue per patient had also dropped more than 20%.[1]

Saint Anthony is looking to the federal courts to enforce its rights under federal law. Saint Anthony may in theory have alternative remedies under its contracts with MCOs. But those are subject to arbitration requirements and are not a promising avenue for relief, at least given the systemic delays and short-changing that Saint Anthony alleges.[2] Moreover,

---

[1] Because the defense moved to dismiss on the pleadings under Rule 12(b)(6), it chose to accept for now the truth of Saint Anthony's factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[2] There is another, more practical problem with the arbitration route. It is doubtful whether a cash-strapped, safety-net hospital could find lawyers to pursue multiple arbitrations with no promise of being paid. Without a claim under section 1983, there is no prospect for a fee award for a prevailing party under 42 U.S.C. § 1988, which may make Saint Anthony's arbitration remedies unavailable as a practical matter, at least absent pro bono representation.

those alternative remedial paths should be irrelevant, at least for step one of the section 1983 analysis, given that the section 1983 remedy is "supplementary to any remedy any State might have." *McNeese v. Board of Education*, 373 U.S. 668, 672 (1963) (holding that availability of section 1983 relief does not depend on failure to exhaust state remedies), cited in *Patsy v. Board of Regents of Florida*, 457 U.S. 496, 500 (1982).

Because the Medicaid statute grants Saint Anthony a right to prompt payment and because Congress did not intend to preclude section 1983 enforcement of that right, I would hold that Saint Anthony can sue to enforce its rights under federal law.

## *A Right to Timely Payments*

Again, the central issue here is whether 42 U.S.C. § 1396u-2(f) grants a right to providers like Saint Anthony that is privately enforceable through section 1983. Our answer should be yes. Properly understood, the statute imposes on the State a duty to try to ensure that the MCOs *actually* pay providers in accord with the 30-day/90 percent–90-day/99 percent pay schedule—not merely that the contracts between the MCOs and the State include clauses that say as much on paper. Congress imposed this affirmative duty on the State for the benefit of health care providers like Saint Anthony. And Congress provided sufficiently clear signals that this is both a duty for the State and a right for providers. Saint Anthony thus should have a right under section 1396u-2(f) that is enforceable under section 1983 to have State officials use their powers to fix MCOs' systemic failures to provide timely and transparent payments.

I.  *The Standard for Invoking Section 1983*

"Section 1983 creates a federal remedy against anyone who, under color of state law, deprives 'any citizen of the United States … of any rights, privileges, or immunities secured by the Constitution and laws.'" *Planned Parenthood of Indiana, Inc. v. Comm'r of Indiana State Dep't of Health*, 699 F.3d 962, 972 (7th Cir. 2012), quoting 42 U.S.C. § 1983. The Supreme Court tells us that this language "means what it says," *Maine v. Thiboutot*, 448 U.S. 1, 4 (1980), and "authorizes suits to enforce individual rights under federal statutes as well as the Constitution." *City of Rancho Palos Verdes v. Abrams*, 544 U.S. 113, 119 (2005). "'Laws' means 'laws,' no less today than in the 1870s…." *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 172 (2023).

Yet not all statutory benefits, requirements, or interests are enforceable under section 1983. The Medicaid Act is an exercise of Congress's power under the Spending Clause, which allows Congress to provide States with strings-attached funding. Such "strings" can create rights for intended beneficiaries of that funding. *Talevski* reinforced earlier precedents allowing rights under Spending Clause legislation to be enforced under section 1983 and set a "demanding bar" for reliance on it: "Statutory provisions must *unambiguously* confer individual federal rights." 599 U.S. at 180, citing *Gonzaga University v. Doe*, 536 U.S. 273, 280 (2002). It is not enough to fall "within the general zone of interest that the statute is intended to protect" to assert a right under section 1983. *Gonzaga*, 536 U.S. at 283. Congress must have "*intended to create a federal right*," *id.*, and "the statute 'must be phrased in terms of the persons benefited' with 'an

*unmistakable focus* on the benefited class.'" *Planned Parenthood of Indiana*, 699 F.3d at 973, quoting *Gonzaga*, 536 U.S. at 284.

The majority recognizes that the Supreme Court's cases on using section 1983 to enforce Spending Clause statutes have not charted a straight line over the decades. Ante at 9–14. *Talevski* is the latest authority in that line. Still, the Court was asked to overrule a number of its precedents in *Talevski*, including one on provider payments that is especially relevant here: *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990). The Court did not do so.

*Talevski* instructs courts at step one of its analysis to "employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." 599 U.S. at 183, quoting *Gonzaga*, 536 U.S. at 283, 285–86. Step two is whether Congress has established an alternative means of enforcing those rights that is not compatible with section 1983 enforcement.

The majority decides this case at step one of *Talevski*, finding no clear statutory grant of a federal right to providers like Saint Anthony. I explain next why this analysis is mistaken, failing to appreciate both the statutory language of section 1396u-2(f) and important signals from its history and larger context. I then address the majority's concerns about the separation of powers and federalism. I conclude by addressing briefly the second step under *Talevski*, which the majority does not reach, and the pleading issue.

## II.  *Applying the Talevski Standard*

Section 1396u-2 of Title 42 of the United States Code gives States the option to use managed care to provide Medicaid

benefits, subject to detailed requirements in the statute and regulations. The analysis here starts with the text of section 1396u-2(f), the provision central to this appeal:

> Timeliness of payment; adequacy of payment for primary care services. A contract under section 1396b(m) of this title with a medicaid managed care organization shall provide that the organization shall make payment to health care providers for items and services which are subject to the contract and that are furnished to individuals eligible for medical assistance under the State plan under this subchapter who are enrolled with the organization on a timely basis consistent with the claims payment procedures described in section 1396a(a)(37)(A) of this title, unless the health care provider and the organization agree to an alternate payment schedule….

The cross-references to sections 1396b(m) and 1396a(a)(37)(A) need to be unpacked. Section 1396b(m) describes the State's contract with an MCO. Section 1396a(a)(37)(A) declares that a State Medicaid plan must:

> (37) provide for claims payment procedures which
>
> (A) ensure that 90 per centum of claims for payment (for which no further written information or substantiation is required in order to make payment) made for services covered under the plan and furnished by health care practitioners through individual or group

> practices or through shared health facilities are
> paid within 30 days of the date of receipt of such
> claims and that 99 per centum of such claims are
> paid within 90 days of the date of receipt of such
> claims….

§ 1396a(a)(37)(A). I refer to this as the 30-day/90-percent schedule, for short. Saint Anthony argues, and I agree, that section 1396u-2(f) grants providers a right to State procedures that will ensure timely payment from the MCOs.

A. *Statutory Text*

The majority acknowledges that providers like Saint Anthony benefit from section 1396u-2(f), but states that these benefits are not "individual-centric right[s]" because providers "merely" fall within the statute's "zone of interest." Ante at 19. Being a beneficiary that falls within a statute's "zone of interest" is not enough under the *Talevski* standard. 599 U.S. at 183, quoting *Gonzaga*, 536 U.S. at 283. The majority's strongest argument against Saint Anthony's reliance on section 1983 is that section 1396u-2(f) does not actually use the term "right" or an equivalent. If it had, of course, the case would be much easier for Saint Anthony.

Precedents from the Supreme Court and this court show, however, that the absence of the word "right" is not conclusive. The analysis is not limited to just the text of the provision in question. As noted, courts "must employ traditional tools of statutory construction to assess whether Congress has 'unambiguously conferred' 'individual rights upon a class of beneficiaries' to which the plaintiff belongs." *Talevski*, 599 U.S. at 183.

Providers like Saint Anthony are the intended beneficiaries of the prompt payment term in section 1396u-2(f). The text requires a State to ensure that its contracts with MCOs "shall provide" that the MCOs "shall make payment to health care *providers* … on a timely basis…." 42 U.S.C. § 1396u-2(f) (emphasis added). No one benefits more directly from a requirement for timely payments to providers than the providers themselves: they are the ones who *receive the money*. See *BT Bourbonnais Care, LLC v. Norwood*, 866 F.3d 815, 821 (7th Cir. 2017) ("Who else would have a greater interest than the [nursing facility operators] in the process 'for determination of rates of payment under the [state] plan for … nursing facility services'?" (second alteration and omission in original) (quoting 42 U.S.C. § 1396a(a)(13)(A)). Congress has sent abundant signals that providers have a right to timely payments from MCOs, as I explain below.

The majority relies so heavily on *Gonzaga*, though, that first a careful comparison to this case will help show why section 1396u-2(f) establishes rights enforceable under section 1983. In *Gonzaga*, a former student sued the university and an employee under section 1983 for allegedly violating his rights under the Family Educational Rights and Privacy Act (FERPA) by releasing his private information. The statute directed the Secretary of Education that "'[n]o funds shall be made available' to any 'educational agency or institution' which has a prohibited 'policy or practice'" of permitting the release of education records without parents' written consent. *Gonzaga*, 536 U.S. at 287 (alteration in original), quoting 20 U.S.C. § 1232g(b)(1); see also § 1232g(b)(2).

The Supreme Court concluded that Congress did not grant to an individual whose interests were violated under

FERPA a right enforceable through section 1983. Because the statutory provisions did not have an individualized focus, they did not confer individual rights: "[The] provisions further speak only in terms of institutional policy and practice, not individual instances of disclosure. Therefore, as in [*Blessing v. Freestone*, 520 U.S. 329 (1997)], they have an 'aggregate' focus, they are not concerned with 'whether the needs of any particular person have been satisfied,' and they cannot 'give rise to individual rights.'" *Gonzaga*, 536 U.S. at 288 (internal citation omitted), quoting *Blessing*, 520 U.S. at 343–44.

The *Gonzaga* Court also highlighted that the Secretary of Education could take away funds only if the university did not "substantially" comply with the statutory requirements. This fact helped show that the focus was on systemwide performance rather than individual instances of improper disclosure of private information. *Gonzaga*, 536 U.S. at 279, 281–82. FERPA's provisions spoke only to the Secretary and directed him or her to withdraw funding from schools that had a "prohibited policy or practice." The Court wrote that FERPA's focus was "two steps removed from the interests of individual students and parents." *Id.* at 287. The provisions therefore failed to confer an individual right enforceable under section 1983.

The opposite is true here. Section 1396u-2(f) is concerned with whether the needs of particular persons and entities—providers like Saint Anthony—have been satisfied. The statutory text specifies that the State "shall provide" that MCOs "shall make payment to health care providers … on a timely basis." 42 U.S.C. § 1396u-2(f). The focus of section 1396u-2(f) is not "two steps removed" from the interest of

providers. It focuses directly on providers' interest in receiving timely payment from MCOs.

Critically, section 1396u-2(f) is not concerned only with whether MCOs pay providers in the aggregate on the 30/90 pay schedule. Recall that in *Gonzaga*, the Court emphasized that FERPA prohibited universities only from maintaining a "policy" of disclosing students' private information, but remained agnostic as to any *individual* disclosure. Logically, that did not confer *individual* rights. In this case, though, § 1396u-2(f) is directly concerned with whether *individual* providers are receiving the payments according to the 30/90 schedule. That specific entitlement—the providers' right to be paid promptly—is substantially more precise than the generalized policy prescription at issue in *Gonzaga*.

This focus on individual providers is also evident in the provision's close attention to provider-specific exemptions from the 30/90 pay schedule. Section 1396u-2(f) says that its mandate applies "unless the health care provider and the organization agree to an alternate payment schedule." It establishes an individual right to timely payment, which all providers are entitled to insist upon. Cf. *Planned Parenthood of Indiana*, 699 F.3d at 974 (holding Medicaid state plan requirement permitting all eligible recipients to receive medical assistance from the provider of their choice established "a personal right to which all Medicaid patients are *entitled*" but, implicitly, need not accept (emphasis added)). Saint Anthony's ability to waive its 30/90 right through alternative contractual provisions highlights that Saint Anthony is the one with the rights. The State has no authority to alter that payment schedule. The focus is on the

individual provider. Section 1396u-2(f) is not just a benchmark for aggregate performance.

That conclusion finds further support in our precedents under other Medicaid provisions. For example, section 1396a(a)(10)(A) provides that "[a] State plan for medical assistance must … provide … for making medical assistance available … to [ ] all [eligible] individuals." That provision does not speak in terms of "rights," but we have held that the provision confers private rights to individuals enforceable under section 1983. See *Miller by Miller v. Whitburn*, 10 F.3d 1315, 1319–20 (7th Cir. 1993) (allowing suit under section 1983 to compel payment for certain procedures although statute did not use language of "rights"); accord, *Bontrager v. Indiana Family & Social Services Admin.*, 697 F.3d 604, 607 (7th Cir. 2012) (reaffirming *Miller*'s rights analysis after *Blessing* and *Gonzaga*; challenge to annual cap on dental services violated rights enforceable under section 1983 despite absence of "rights" language). In *Miller*, we found it significant that the State was *required* to provide medical assistance to all eligible individuals. 10 F.3d at 1319. There is a similar requirement here, with respect to timely payments to providers.

B. *History and Context*

The history and context of section 1396u-2(f) also support finding a right enforceable under section 1983. Context and history are standard tools in construing statutes, of course, and *Talevski* and *Gonzaga* both instruct courts to use them in answering such questions about applying section 1983. 599 U.S. at 183; 536 U.S. at 283–86. The majority nods in that direction, but it fails to acknowledge the cumulative effect of many signals from the history and context here. The majority

instead goes through those signals and explains why each one, taken in isolation, is not decisive. See ante at 19–24.

With respect, that's not the way to do statutory interpretation. Instead, we should be looking at the *cumulative effect* of those signals from history and context. See *United Savings Ass'n of Texas v. Timbers of Inwood Forest Assocs.*, 484 U.S. 365, 371 (1988) ("Statutory construction, however, is a holistic endeavor."). When interpreting statutes, often the "meaning—or ambiguity—of certain words or phrases may only become evident when placed in context." *King v. Burwell*, 576 U.S. 473, 486 (2015), quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 132 (2000). We must read texts "in their context and with a view to their place in the overall statutory scheme." *Id.*, quoting *Brown & Williamson*, 529 U.S. at 133; see also *Davis v. Michigan Dep't of Treasury*, 489 U.S. 803, 809 (1989) ("[S]tatutory language cannot be construed in a vacuum. It is a fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."). And to the extent possible, we must "ensure that the statutory scheme is coherent and consistent." *Ali v. Federal Bureau of Prisons*, 552 U.S. 214, 222 (2008). That's what the Supreme Court did in both *Talevski*, finding several rights of patients under the Medicaid Act enforceable under section 1983, and in *Gonzaga*, rejecting such rights claims under FERPA**.**

The history of the shift toward managed care provides one of the strongest signals in favor of section 1983 enforcement. Under the original fee-for-service model of Medicaid, the State itself is responsible for making prompt payments to providers at reasonable rates. The 30-day/90-percent schedule for payments by MCOs under section 1396u-2(f) is borrowed

from section 1396a(a)(37)(A), which imposes that schedule on State payments directly to providers in the fee-for-service system. The State has no discretion to avoid making payments on that schedule.

Before Congress adopted section 1396u-2(f) for managed care systems, the Supreme Court decided *Wilder v. Virginia Hospital Ass'n*, 496 U.S. 498 (1990). The so-called Boren Amendment then required States to pay Medicaid providers rates for medical services that were "reasonable and adequate to meet the costs of an efficiently and economically operated facility." *Wilder* held that the Boren Amendment—without using the term "rights"—nevertheless created rights enforceable under section 1983 with injunctive relief to require state officials' compliance. *Id*. at 510, 524. The Court noted that the Boren Amendment used mandatory language and that the Secretary was authorized to withhold funds for noncompliance, counseling in favor of finding an individual right to reasonable rates. *Id.* at 512. The Court "decline[d] to adopt an interpretation of the Boren Amendment that would render it a dead letter." *Id.* at 514.

The reasoning of *Wilder* easily extends to the statutory provision governing the timing of payments of those rates, the fee-for-service prompt payment rule of section 1396a(a)(37)(A). See, e.g., *Appalachian Regional Healthcare v. Coventry Health & Life Insurance Co.*, 970 F. Supp. 2d 687, 697–700 (E.D. Ky. 2013) (denying summary judgment for state officials in section 1983 case to enforce section 1396u-2(f)). Other circuits have followed *Wilder* to allow use of section 1983 to enforce other Medicaid requirements for payments to providers under both the fee-for-service model *and managed care*. See *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 211–

12 (4th Cir. 2007) (following *Wilder* and allowing use of section 1983 to enforce another Medicaid payment requirement under fee-for-service model); *New Jersey Primary Care Ass'n v. New Jersey Dep't of Human Services*, 722 F.3d 527, 539–43 (3d Cir. 2013) (allowing providers' use of section 1983 to enforce Medicaid wraparound payment provision under managed care, despite absence of reference to "right," while disallowing its use to require federal approval of changes in Medicaid plans); *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 73–75 (1st Cir. 2005) (reaching same conclusion regarding wraparound payment provision); *Community Health Care Ass'n of New York v. Shah*, 770 F.3d 129, 153–58 (2d Cir. 2014) (allowing use of section 1983 to enforce two Medicaid payment requirements under managed care despite absence of reference to "right").

Seven years after *Wilder*, section 1396u-2(f) was enacted as part of the Balanced Budget Act of 1997, Pub. L. No. 105-33, 111 Stat. 251 (1997). It was part of the detailed package of new statutes that enabled the dramatic expansion of managed care in state Medicaid programs.

The timing shows that, when Congress extended the prompt payment rules of section 1396a(a)(37)(A) to managed care via section 1396u-2(f), providers like Saint Anthony already had a recognized right to prompt payments. Under *Wilder*, they could enforce that right under section 1983 with declaratory and injunctive relief. Neither the majority nor the State has identified *any* indication that Congress intended to *cut back* on providers' existing rights when it enacted section 1396u-2(f) to extend the prompt payment rule to managed care. That silence is a powerful signal that we should allow this case to move forward under section 1983.

*Talevski* also shows that courts should pay attention to statutory context when addressing these questions. A good example was the treatment of the requirement in *Talevski* that a nursing home give a resident and his or her family advance notice that the home intends to discharge the resident. That statutory requirement also is not phrased in terms of a "right" to such notice. The Court observed, however, that it is "[n]estled in a paragraph" with the heading "transfer and discharge *rights*." 599 U.S. at 184–85. The requirement for notice is also phrased in terms of the resident's welfare, health, and needs, lending further and ultimately sufficient weight to the conclusion that the notice requirement was enforceable under section 1983. *Id.* at 185.

The prompt payment rule for managed care at issue here has similar indications of enforceable rights. The Balanced Budget Act of 1997 put section 1396u-2(f) in a section entitled: "Assuring Timeliness of Provider Payments." 111 Stat. at 506. This language signaled that Congress intended section 1396u-2(f) to "assure," i.e., to guarantee, timely payment to providers. That language of assurance further supports recognizing a right enforceable under section 1983.

The majority points out correctly, of course, that statutory headings and titles should be used with caution. See ante at 22, citing *Brotherhood of R.R. Trainmen v. Baltimore & Ohio R.R. Co.*, 331 U.S. 519, 528 (1947). But the majority goes too far in asserting that if consideration of a title is warranted, the statute must therefore be too ambiguous to support a right enforceable under section 1983. First, *Talevski* itself rebuts the majority's point. *Talevski* relied upon a statutory heading and explained that the "framing" of the heading was "indicative of an individual 'rights-creating' focus." 599 U.S. at 184.

Second, the "assuring timeliness" title simply provides further support for an already coherent statutory message and therefore need not be ignored. See, e.g., *United States v. Spears*, 729 F.3d 753, 756 (7th Cir. 2013) (en banc) (collecting cases; captions can clear up ambiguities and help explicate texts). The headings and titles are just one of those "traditional tools of statutory construction" that both *Talevski* and *Gonzaga* teach us to use. *Talevski* 599 U.S. at 183, quoting *Gonzaga*, 536 U.S. at 283, 285–86.

The signal in these headings and titles does not stand alone. Treating section 1396u-2(f) as granting rights to providers is also consistent with later Congressional action. In 2009 Congress amended the same section by adding § 1396u-2(h). See Pub. L. No. 111-5, 123 Stat. 115, § 5006(d) (2009). That new subsection established special rules for Medicaid managed care for Indians. 123 Stat. at 507. Relevant to our purposes, section 1396u-2(h)(2)(B) cross-references section 1396u-2(f) and describes it as the "rule for prompt payment of providers":

> (2) Assurance of payment to Indian health care providers for provision of covered services
>
> Each contract with a managed care entity under section 1396b(m) of this title or under section 1396d(t)(3) of this title shall require any such entity, as a condition of receiving payment under such contract, to satisfy the following requirements:
>
> …

(B) Prompt payment

To agree to make prompt payment (*consistent with rule for prompt payment of providers under section 1396u–2(f) of this title*) to Indian health care providers that are participating providers with respect to such entity….

42 U.S.C. § 1396u-2(h)(2)(B) (emphasis added).

The majority shrugs this off as mere "shorthand." Ante at 23, citing Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts 316 (2012). By itself that reference to the "rule for prompt payment" would not be enough to satisfy the *Talevski* standard. But again, the "rule for prompt payment" language is part of a larger picture of statutory language, history, and context that points consistently toward a right enforceable under section 1983. We should not reject that larger picture merely because no single detail—considered on its own—proves the entire case. See *Brown & Williamson Tobacco Corp.*, 529 U.S. at 133 (explaining that a court must interpret a statute "as a symmetrical and coherent regulatory scheme … and fit, if possible, all parts into an harmonious whole" (internal citations and quotation marks omitted)).

I recognize that *Wilder* may lie close to the outer edge of the line for Spending Clause legislation enforceable under section 1983. Nevertheless, the Court was invited in *Talevski* to overrule *Wilder* and chose not to do so. Recognizing section 1396u-2(f) as creating rights enforceable under section 1983 does not push the logic of *Wilder* or *Talevski* any further than the Court itself has already taken it. Section 1396u-2(f) gives

providers like Saint Anthony a right to have State officials do their jobs by assuring that MCOs make timely payments.

Against this picture of an enforceable right to protect providers like Saint Anthony from systemic breakdowns in payments—breakdowns the MCOs have strong incentives to try to get away with—compare the position of the State officials and the majority here. Section 1396u-2(f) mandates that the State's contracts with the MCOs require them to pay providers on the 30/90 pay schedule. The State asserts, however, that section 1396u-2(f) does not impose a duty on the State *even to try* to ensure that MCOs actually do what their contracts say. The State's theory is that the statute requires only that a provision in the paper contract specify the timely payment obligation. The State may then, at its unfettered discretion, try to ensure the MCOs' compliance— or not.

The State seems to adopt something like Justice Holmes' theory of contract, under which one party is free to breach as long as it is willing to pay damages to the other party. See, e.g., Richard Posner, *Let Us Never Blame a Contract Breaker*, 107 Mich. L. Rev. 1349, 1350 (2009) ("[W]hen you sign a contract in which you promise a specified performance … you buy an option to perform or pay damages."). The State is claiming an unfettered right to decide whether to assert its contractual rights against MCOs, leaving providers like Saint Anthony to fend for themselves as best they can in the face of systemic and crippling breaches by MCOs.

I do not read section 1396u-2(f) as permitting such a hands-off approach. The Holmesian theory works with private contracts that do not implicate larger social and public interests. It does not fit with Medicaid, a program that

provides critical health care to more than 70 million Americans. Actual performance matters, and it matters to Congress. A reasonable State official deciding whether to accept federal Medicaid money would not have expected she could take that hands-off approach to MCO payments to providers. The Medicaid statute does not allow a State to accept federal Medicaid funds, to delegate implementation to MCOs, and then to wash its hands of supervising that implementation.

Congress certainly did not intend for MCOs to go unsupervised. It knew that MCOs have powerful incentives to delay payment to providers for as long as possible and ultimately to underpay to maximize their own profits. The Act therefore contains several provisions to counteract that problem in addition to section 1396u-2(f). They also help inform our understanding of the particular provision in dispute here.

The Act imposes reporting and oversight responsibilities on States that use managed care. For example, section 1396b(m)(2)(A)(iv) requires a State's contract with an MCO to permit the State "to audit and inspect any books and records" of an MCO related to "services performed or determinations of amounts payable under the contract." Section 1396u-2(c)(2)(A)(i) further specifies that a State's contract with an MCO must "provide for an annual (as appropriate) external independent review" of the "timeliness" of MCO "services for which the organization is responsible," including payments. The Medicaid Act thus does not leave State officials free to rely on the terms of their paper contracts and just to assume MCOs are making timely payments. The Act instead requires State officials to monitor MCO payment activities to gather

performance data so that they know how the system is functioning.

The Act further specifies that a State must establish provisions for imposing "intermediate sanctions" against an MCO—short of cancelling an entire contract—that the State can use when an MCO underperforms. 42 U.S.C. § 1396u-2(e). The State can put an MCO on a performance plan, for example. As discovery in this case revealed, Illinois has taken that step with CountyCare, an MCO, after CountyCare paid only 40% of claims within 30 days and only 62% of claims within 90 days. The CountyCare case showed the incentive problem in real life. The State found that CountyCare's Medicaid money was improperly diverted from the Medicaid program to pay other county government bills rather than health care providers.[3]

The majority makes much of the State's "discretionary" contractual enforcement authority. E.g., ante at 21, 24. But not all of the State's remedial obligations are discretionary. In a case where an MCO has "repeatedly failed to meet the requirements" of its contract with the State and the requirements in section 1396u-2, "the State *shall* (regardless of what other sanctions are provided) impose the sanctions described in subparagraphs (B) and (C) of paragraph (2)." 42 U.S.C. § 1396u-2(e)(3) (emphasis added). Subparagraph (B) details the appointment of temporary management to oversee the MCO. § 1396u-2(e)(2)(B). Subparagraph (C) permits

---

[3] We may consider the CountyCare information in evaluating the Rule 12(b)(6) motion without converting the motion into one for summary judgment. The information elaborates on and illustrates factual allegations in the complaint. E.g., *Geinosky v. City of Chicago*, 675 F.3d 743, 745 n.1 (7th Cir. 2012).

individuals enrolled with the MCO to terminate enrollment without cause. § 1396u-2(e)(2)(C). This *mandatory* enforcement provision, alone, should cast doubt on the State's Holmesian approach to Medicaid contracting because it obliges the State to take remedial actions.

Federal regulations add to the State's oversight responsibilities here. For instance, 42 C.F.R. § 438.66(a) (2016) provides: "The State agency must have in effect a monitoring system for all managed care programs." The State's monitoring system "must address all aspects of the managed care program, including the performance of each MCO … in … [c]laims management." § 438.66(b)(3). It's hard to imagine a more central aspect of claims management than timely payments. Saint Anthony alleges here that the State is failing even to *collect* the required data on the timeliness of MCO payments.

These oversight responsibilities help show that Congress imposed on States a duty to ensure that the *right* to timely payment protected in section 1396u-2(f) is honored in real life. I therefore reject the State's argument that Congress intended to leave the issue of real-life compliance to the unfettered discretion of State and federal oversight authorities. Congress chose language that makes timely payment more than just a paper requirement.

The more coherent reading of the statute as a whole—taken in context and with an understanding of its history—is that Congress intended the State to report on and oversee MCOs and, if an MCO is systematically not paying providers on a timely basis, to impose on the State an obligation to act under section 1396u-2(f) to secure providers' rights. These mandatory oversight responsibilities would make little sense

if that were not the case. The mandatory statutory language, coupled with the additional oversight and reporting responsibilities, helps show that section 1396u-2(f) must be doing more than imposing merely the formality of contract language. Providers' right to timely payment must exist in reality. Section 1396u-2(f) defines the minimum terms of the provider's right to timely payment and is provider-specific. It uses "individually focused terminology," *Gonzaga*, 536 U.S. at 287, unmistakably "phrased in terms of the persons benefited." *Id.* at 284, quoting *Cannon v. University of Chicago*, 441 U.S. 677, 692 n.13 (1979).[4]

C.  *Fair Notice to the State?*

In leaving Saint Anthony to pursue arbitrations against all the MCOs, despite State officials' (alleged) failures to address systemic problems with payments, the majority also invokes concern over separation of powers and federalism. Ante at 24–29. The majority fears that Illinois was not on fair notice that its officials would be expected to ensure timely MCO payments to providers, and that providers might be able to obtain injunctive relief under section 1983 to make the officials do their jobs.

To determine whether Congress spoke clearly to create rights in this case, "we must view [the legislation] from the perspective of a state official who is engaged in the process of deciding whether the State should accept [federal] funds and the obligations that go with those funds." *Arlington Central School Dist. v. Murphy*, 548 U.S. 291, 296 (2006) (applying test

---

[4] The panel opinion summarized why this view is also consistent with the so-called *Blessing* factors. See *Saint Anthony Hospital v. Whitehorn*, 100 F.4th 767, 786–87 (2024).

to federal funds for educating individuals with disabilities). For the reasons explained above, a reasonable State official would not have expected that she could use MCOs to pay for Medicaid care without also taking on significant oversight and enforcement duties to ensure timely payments to providers. She would not have expected that she could ignore actual performance under the relevant contracts.

The majority assures us, though, that providers are protected because the Medicaid Act gives the federal government a nuclear bomb to use against States whose officials fail to comply with the Act: cutting off federal Medicaid funds. See ante at 26–27, citing *Pennhurst*, 451 U.S. at 28, and relying on 42 U.S.C. § 1396c (authorizing that penalty). True enough, but let's be realistic. All States are now dependent on federal Medicaid dollars. To my knowledge, the federal government has never actually used that doomsday power against a State. Cf. *National Fed'n of Independent Business v. Sebelius*, 567 U.S. 519, 581–85 (2012) (holding unconstitutional as unduly coercive a statutory threat to cut off all Medicaid funds to States that did not agree to expanded coverage under Affordable Care Act).

Further along the lines of federalism concerns, the majority echoes the State's parade of horribles in which federal district courts are turned into "de facto Medicaid claims processors." Ante at 27. The panel explained why that prize-winning float in the parade should not lead us to deny all relief. District courts have ample means to require State officials to do their jobs without taking over administration of claims. 100 F.4th at 789–92.

The majority also seems to misunderstand Saint Anthony's focus on the need for a remedy for systemic

breakdowns. See ante at 28. Saint Anthony has an individual right to timely payments from each MCO covering its patients. The question of systemic breakdowns applies to the payments to Saint Anthony individually, not to the system for all hospitals, for example. The majority's concern about the difficulty in gauging when a breakdown is "systemic" is at worst a problem for another day, not a reason to deny relief altogether. As the panel noted using a common metaphor in the law, people can usually tell whether they are standing on a plain, amid foothills, or in the mountains, even if those boundaries are not sharp. 100 F.4th at 792. And the CountyCare case discussed above, where State officials did intervene to fix an MCO's terrible payment performance, shows that the officials can tell the difference.

I recognize that part of the rationale for adopting the managed care model was to ease the State's administrative burden. Measures that would force the State to take a more aggressive oversight role could reduce some of the administrative benefits the State might have hoped to gain by switching to managed care. But while the Medicaid Act permits States to shift major Medicaid duties to MCOs, it does not allow States to wash their hands of effective oversight. On the contrary, the Medicaid Act in general, and section 1396u-2(f) in particular, show that Congress recognized the troublesome financial incentives inherent in a managed care system and the need for effective oversight of MCOs and their treatment of providers' claims for payment.

The majority, however, seems to assume a false choice. It assumes that if Saint Anthony can prove its allegations, the judicial choice is binary: either the district court must prepare

to take over day-to-day claims management, or no relief is available at all. The options are not so limited.

First, the Medicaid Act and the relevant contracts recognize that perfection is not required. That much is clear from the 30-day/90-percent pay schedule itself: pay 90% of clean claims within 30 days and 99% within 90 days.

Second, the State itself seems to be able to tell the difference between minor problems and systemic ones. There is good reason to think it can identify systemic measures that can be effective without having the State (let alone the district court) take over day-to-day claims management. As noted above, for example, the State took action against CountyCare when it "was not regularly meeting" the 30-day/90-percent pay schedule. Decl. of Robert Mendonsa ¶ 16, Dkt. 86-10. The State investigated, demanded that CountyCare adopt a "Corrective Action Plan," and reported that a few months after adopting such a plan, CountyCare "significantly reduced the number of outstanding claims that [were] older than 90 days." *Id*. ¶¶ 17–21. We need not and should not adopt a mathematical definition of "systemic" failures at the pleadings stage. That problem could await further factual development if and when it presents a hard question.

III. *Additional Issues*

Step two of the *Talevski* test would allow the State to try to show that a section 1983 remedy is implicitly barred because it would be incompatible with remedies available under the Medicaid Act itself. As the Court in *Talevski* explained, the burden is on the defendant to make such a showing. 599 U.S. at 186. This is a "difficult showing." *Blessing*, 520 U.S. at 346. The panel majority explained why the State has not made that

showing here. 100 F.4th at 792–93. Since the majority does not reach this issue, there is no need to repeat that explanation.

The last issue the majority addresses is Saint Anthony's motion to supplement its complaint to allege due process claims against the State officials and MCOs concerning the handling of Medicaid claims under both the managed care and fee-for-service systems. The majority properly, if gently, criticizes the district court for expressing a view on the futility of the supplement without even having allowed Saint Anthony to address the merits. Ante at 30. I am satisfied with the majority's bottom line, which leaves the door open for Saint Anthony to pursue that claim in a new case.

\* \* \* \* \*

This is a hard case with high stakes for the State, for Medicaid providers, and especially for Medicaid patients. We are deciding this case only on the pleadings. There is one genuine binary choice in this case: whether to affirm dismissal of Saint Anthony's claims under section 1983 for failure to state a claim—no matter how egregious and systemic the MCOs' slow payments, no matter how little the State has done to ensure timely payments, and no matter how devastating the effects of the delays on Saint Anthony and its patients. We should reverse dismissal and allow this case to move forward. This en banc affirmance of the dismissal, however, is probably the end of the line for Saint Anthony's case under section 1983. Perhaps Saint Anthony and other distressed hospitals and providers might find a more receptive audience in Congress. I respectfully dissent.